JASON W. DUGUID, *et al. vs.* JAMES EDWARDS, Jr. *et al.*

Where parties sending property to commission merchants to be sold, are not shown to have had notice of the manner in which the latter are in the habit of disposing of the proceeds of their customer's property, the mere existence of a usage and custom on that subject, among commission merchants, cannot affect the rights of the consignors, those being defined and regulated by well settled rules of law. And those rules cannot be abrogated, or overthrown, because it may be the custom of the business to which they relate, to disregard them,

Duguid *v.* Edwards.

Where a particular mode is adopted and pursued for the transaction of the business of another, with his knowledge or assent, he will be concluded by it, and subject to all the consequences resulting from it. But where that differs from the settled obligations and duties established by law, such knowledge or assent must be shown, before the party entrusting his business to another can be affected by the change.

Hence customs and usages which would have the effect of relieving a party from the duties and obligations the law would otherwise impose upon him are not allowed to prevail, unless the actual assent of the other party is secured for their observance, or they are of so notorious a character as reasonably to lead to the conclusion that he must have known of their existence, and intended to assent to them. And even then, they must not be unreasonable, nor positively unlawful.

Where principals are not shown to have known or assented to the course of business adopted by factors in the disposition made of their customers' funds, as they are not precluded from the assertion of their legal rights by the mere existence and observance of a usage not known or assented to by them, those rights, as well as the obligations of the factors arising out of the sale of their principals' property, must be governed solely by the principles of law applicable to them.

Commission merchants, to whom property is consigned by the owner, for sale, are the *factors* of the owner. They do not acquire any title or interest in the property itself, beyond a mere lien for their advances in paying the expenses of its transportation to them. If they have actually made further advances upon the faith of consignments made to them, that will give them no title to the property, but will merely increase the extent of their lien.

When they sell the property, even though they do so in their own names, and may consequently be regarded by the purchaser as the owner of it, as between themselves and the consignors, they will be deemed as selling as the agents of the latter and as selling their property.

There is nothing in such a transaction which will vest the factors with the title to the proceeds derived from such sales. On the contrary, they will receive such proceeds as the substitute or representative of the property sold, subject to the same lien, under the trust, implied of course, that the excess beyond what shall be required to discharge such lien, will be held for and paid over to the consignors.

If the factors mingle such proceeds of sales with their own funds, by depositing them in bank to their credit in a general account, use the money in their business generally, and fail to pay over the same on demand, they thereby subject themselves to the legal liabilities arising from the misapplication of another's property, and to an *arrest*, under the provisions of the Code, as having received the money in a *fiduciary* capacity.

The understanding of the legislature seems to have been that factors, agents

and brokers, when acting in their capacities as such, are acting in fiduciary capacities, and they have accordingly provided for their arrest, as well as for the arrest of all other persons who may receive and misapply moneys received by them in the course of their fiduciary relations. *Per* DANIELS, J.

APPEAL from an order made at a special term, vacating an order of arrest.

*R. Ballard*, for the appellants.

*E. C. Sprague*, for the respondents.

DANIELS, J. The plaintiffs, who were engaged in business as millers in Le Roy, during the fall of 1865, sent to the defendants, who were commission merchants at Albany, seven hundred barrels of flour, in quantities of one hundred barrels, to be sold by the defendants in the course of their business. During that time, and afterwards, before their failure, they sold on account of the plaintiffs four hundred and forty-five barrels of the flour, sent one hundred and fifty barrels to their agents in the city of New York, which were sold by them, and returned the residue, one hundred and five barrels to the plaintiffs, which were on hand at the time when the defendants failed. The expectation of the plaintiffs was that the flour sent by them to the defendants, would be sold in the Albany market. And the tenor of all the correspondence between the parties concerning the sales, is to that effect. The defendants in sending the one hundred and fifty barrels of flour to New York, there to be sold by their agents instead of by themselves, to whom the plaintiffs entrusted it, violated their obligations to the plaintiffs; and if the order of arrest stood upon that transaction alone, there would be no legal obstacle in the way of sustaining it; for the statements made in the defendants' affidavits are insufficient to establish the acquiescence or approval of the plaintiffs, of this change made in the disposition of their property. On the other hand, the letters of the plaintiffs

Duguid *v.* Edwards.

afterwards written to and received by the defendants, announce their unqualified disapproval of the act.. And although these one hundred and fifty barrels of flour were afterwards sold by the defendants' agents in the city of New York, no part of the proceeds are shown to have been directly or indirectly returned to the plaintiffs. But the order of arrest was made for the arrest of the defendants, not only for this violation of the defendants' duties as factors; for such in judgment of law it was, but also for the non-payment of a balance of $211.15 remaining in their hands from the proceeds of the sales actually made by them. And this balance is claimed to be recovered, by the complaint, in addition to the value of the flour sent by the defendants to the city of New York. To sustain the order of arrest, therefore, it becomes necessary that the plaintiffs shall establish their right to arrest the defendants for this balance, as well as the value of the flour sent without authority to the city of New York. For if the plaintiffs had no right to an order of arrest upon that part of their cause of action, it is not sufficient to maintain the order that the defendants were liable to arrest upon the residue. This conclusion is fully sustained by the decision of this court in the case of *Brown* v. *Peat*, (1 *Hill*, 225.)

The important point, therefore, to be determined in the case is, whether the defendants are liable to be arrested on account of the balance remaining in their hands from the proceeds of the sales made by themselves. And this depends upon the legal obligations they incurred to the plaintiffs by the acceptance and sale of the flour consigned to them. The plaintiffs claim in the affidavit upon which the order of arrest was made, that a specific agreement was made by the defendants that they would accept and sell the flour, and return and pay over the proceeds of the sales to the plaintiffs. But this is denied by the defendants, and the plaintiffs' letters to them so far sustain and fortify them in the denial, as to render it highly probable that no such agreement was specifically made.

Duguid *v.* Edwards.

The rights and obligations of the parties must, therefore, be determined by the general principles of law applicable to the relations existing between the parties.

For the purpose of qualifying those relations, various circumstances and usages are repeatedly set forth in the defendants' affidavits, from which it is claimed by them that their relations to the plaintiffs were not those of ordinary factors, but were substantially those of debtor and creditor. And for that purpose, it is stated that the defendants, when they received the flour in controversy, were carrying on a general commission business at the city of Albany. So far as property was consigned to them for sale, they paid the freight and other charges incident to its transportation upon it, and when they sold it they did so in their own names, either separately or with other property of the same description belonging to other parties, as might prove convenient and suitable for their customers, receiving payment for it in gross, and crediting the plaintiffs their proportion of the purchase price. That they deposited the proceeds of their sales in general account, without distinguishing the portions arising from the sales of the property of any particular individual. And in making payment to their principals, or consignors, they did so by accepting and paying the drafts drawn by them for the balances appearing by way of credits upon their books, or by remittances made directly to them. From this mode of transacting their business, which they show was followed by others in the same business at Albany, and in the other commercial cities, the defendants insist that the moneys they received from the sale of the plaintiffs flour became their property, instead of the property of the plaintiffs, and they became indebted simply to the plaintiffs for the balance remaining in their hands after their advances and commissions were deducted. No direct knowledge is stated to have been communicated to the plaintiffs that this was the mode adopted by the defendants in the transaction of their commission business. But it is asserted that it was known to shippers

generally, who sent their property to commission houses for sale, and from the course of business pursued between themselves and the plaintiffs, it is claimed that the latter must have known it also. The course of business, from which it is claimed the plaintiffs must have derived this knowledge, is stated to have consisted of the circumstances that whenever sales were made of the plaintiffs' flour, the defendants credited the amount due to the former in their account, and forwarded to them accounts of the sales ; that in one instance the plaintiffs drew a draft at thirty days upon them for eighteen hundred dollars, and in another they sent the plaintiffs their check for two thousand dollars. And the plaintiffs made their order notes payable at the defendants' office in Albany with the understanding that they should be paid out out of the proceeds of the sales of their flour, or if they should prove to be insufficient, they would forward the defendants funds to pay them with. These, with the additional circumstances that the defendants when they received the flour advanced the freight, and paid such other charges as were incidental to its transportation, constitute the course of business from which it is maintained that the plaintiffs must have derived this knowledge. It is quite clear that no such information would necessarily be derived from it. The advances made for the payment of the expenses of transportation, which were all that the defendants did advance, were simply those which consignees have generally made in the ordinary course of commercial business, when they have received the property which others have consigned to them for sale in the way of their business. The fact that the defendants accepted the plaintiffs' draft, and paid it when it matured, out of the amount then due for sales actually made, and which fairly and reasonably the plaintiffs might anticipate would be made before its maturity, together with the receipt by the plaintiffs of the defendants' check for the amount due on account of sales made after the payment of the drafts and the making of their notes payable at the

Duguid *v.* Edwards.

defendants' office if the proceeds arising from the sales of the plaintiffs' property were sufficient when they became due, to warrant such payment, could give the plaintiffs no notice that the defendants claimed such proceeds as their own, and deposited and used them as such in the course of their business. On the other hand, the credits and accounts of sales made and rendered by the defendants, would rather induce the plaintiffs to believe that the defendants had their moneys on hand which they were holding for them, to the extent indicated by such credits and accounts. And when they drew their draft, and made their notes payable at the defendants' office, they resorted to the ordinary commercial means of appropriating the proceeds of the sales of their property to their own business uses and purposes. Instead of indicating knowledge on their part, that the defendants claimed, appropriated and used those proceeds as their property, this constituted a direct assertion of the plaintiffs' right to them. That the plaintiffs expected no advances from the defendants, is very clear from the understanding set forth in the affidadavit, that the plaintiffs were to furnish the means of taking up their notes if the moneys standing to their credit with the defendants did not enable the latter to pay them.

As the plaintiffs are not shown to have had notice of the manner in which the defendants disposed of the proceeds of their customers' property, the mere existence of the usage and custom relating to it among commission merchants cannot affect their rights, for those are defined and regulated by well settled rules of law. And those rules cannot be abrogated, or overthrown, because it may be the custom of the business to which they relate, to disregard them. Where a particular mode is adopted and pursued for the transaction of the business of another, with his knowledge or assent, he would be concluded by it, and subject to all the consequences resulting from it But where that differs from the settled obligations and duties established by law, such knowledge or assent must he shown, before the party entrusting his busi-

ness to another can be affected by the change. Hence, customs and usages which would have the effect of relieving a party from the duties and obligations the law would otherwise impose upon him, are not allowed to prevail, unless the actual assent of the other party is secured for their observance, or they are of so notorious a character as reasonably to lead to the conclusion that he must have known of their existence, and intended to assent to them. And even then they must not be unreasonable, nor positively unlawful. That the usage or custom itself will not be sufficient to deprive a party of the rights otherwise secured to him by law, is so well established by the decisions as to need only a reference to them, to confirm that conclusion. The cases of *Thompson* v. *Ashton,* (14 *John.* 316 ;) *Beirne* v. *Dord,* (1 *Seld.* 95, 101, 102 ;) *Wheeler* v. *Newbould,* (16 *N. Y. Rep.* 392, 401, 402 ;) and *Streever* v. *Bank of Fort Edward,* (34 *id.* 413,) will be found to fully maintain this principle.

As, therefore, the plaintiffs are not shown to have known or assented to the course of business adopted by the defendants in the disposition made of their customers' funds, and they are not precluded from the assertion of their legal rights by the mere existence and observance of a usage not known or assented to by them, those rights, as well as the obligations of the defendants arising out of the sale of the plaintiffs' property, must be governed solely by the principles of law applicable to them. It will be, therefore, necessary to ascertain what those principles are, and what were the duties which they imposed upon the defendants concerning the proceeds of the plaintiffs' flour.

As already remarked, the defendants were factors, within the legal definition of that term. Story defines a factor to be, "an agent employed to sell goods, or merchandise, consigned or delivered to him, by or for his principal, for a compensation, commonly called factorage, or commission. Hence he is often called a commission merchant, or consignee ; the goods received by him for sale are called a consignment ;

and when, for an additional compensation in case of sale, he undertakes to guaranty to his principal the payment of the debt due by the buyer, he is said to receive a *del credere* commission." (*Story on Agency,* § 33.) And the defendants' business very plainly falls within that definition. As factors, therefore, they received the flour which the plaintiffs sent them for sale, not for themselves, or as their property, but for the plaintiffs, and as their property. Although it was sent to the defendants to be sold by them, they did not acquire any title or interest in the property itself, beyond a mere lien for their advances in paying the expenses of its transportation to them. And if they had actually made further advances upon the faith of the consignments made to them, that would have given them no title to the flour, but merely increased the extent of their lien. When, therefore, the defendants sold the flour, even though they did so in their own names, and may consequently have been regarded by the purchasers as the owners of it, as between themselves and the plaintiffs, they sold as their agents, and in selling it, sold their property. There certainly was nothing in the transaction, as thus regarded, which would vest the defendants with the title to the proceeds derived from such sales. On the contrary, they received them as the substitute or representative of the property they had sold, subject to the same lien, under the trust, implied, of course, that the excess beyond what should be required to discharge such lien, would be held for, and paid over to the plaintiffs. When one person, or firm, sells property for the owner, under his authority, without any express or implied understanding that the proceeds shall be differently disposed of, the seller receives them as the property of the person for whom the sale was made, to be paid over to him, or otherwise disposed of as he may direct. And where the sale is made by a factor or commission merchant, no reason exists for excluding it from the operation of this principle. If the seller in that case make use of the proceeds of the property in his own

Duguid *v.* Edwards.

business, as he may lawfully use his own funds, he can only do so by subjecting himself to the legal liabilities arising out of the misappropriation of another's property. He assumes the responsibility of making the fund· good to his employer on demand, or in the case of his failure to do so, submitting to the legal.consequences of his unauthorized act, when the sale is made by the factor, even though it be in his own name, it creates a contract between the principal and the buyer. And payment may afterwards be required, by the principal to be made to himself, in case a credit be given, or the purchase price be not previously paid to the factor, and payment afterwards made to the latter will not discharge the obligation of the buyer, (*Morris* v. *Cleasby*, 1 *Maule & Sel.* 576,) which could not be the case if the factor by the sale acquired a property in its proceeds as against the principal. (*See also Kelley* v. *Munson*, 7 *Mass. R.* 319.) So completely do the proceeds of the sale made by the factor become the property of the principal by force of the sale itself, that he may follow them as far as he may be able to identify them, unless they have been passed to a *bona fide* purchaser. (2 *Kent's Com.* 796, 801.) Hence, if the factor become bankrupt or insolvent, the principal's right to the proceeds of his property is paramount to that of the general assignee, or the assignee in bankruptcy. And he may follow and recover them accordingly. (*Story on Agency*, § 229. *Thompson* v. *Perkins*, 3 *Mason*, 232. *Denston* v. *Perkins*, 2 *Pick.* 86. 2 *Story's Eq. Jur.* § 1258, *note* 3, *and cases there cited.*) Where the factor received a note from the purchaser, which he procured to be discounted and placed to his credit in his bank account, and the credit was afterwards attached by process in favor of other creditors, it was held that the principal could follow the fund, and that his right to recover it as the proceeds of his property was paramount to the attachment of the factor's other creditors. (*Merrill* v. *Bank of Norfolk*, 19 *Pick.* 32.) And the existence of a usage and custom like that relied upon by the defendants,

was held by the same court, to be insufficient to prevent the principal from following the proceeds the factor received from the sale of his property. (*Chesterfield Manufacturing Co.* v. *Dehon*, 5 *Pick.* 7.) For the reason that the proceeds of the principal's property belong to him, the factor has been held not to be liable for the debt owing by the purchaser, even though he gave the principal his note, including in it that and other demands, where the debt was afterwards lost without his fault. (*Hopgood* v. *Batcheller*, 4 *Metc.* 573.)

The case of *Chapman* v. *Forsyth*, (2 *How. U. S. Rep.* 202,) is not in conflict with the principle of the common law, as it is here stated, which defines and governs the rights of the principal, and the duties and obligations of the factor, arising out of the sale of the property of the former. In that case the question was not whether the factor was a person who acted in a fiduciary capacity, but whether he was within the signification of those terms as they were used in the bankrupt act of 1842. It was assumed by Judge McLean, who delivered the opinion of the court, that a factor was a person who acted in a fiduciary capacity, and that he held the proceeds of his principal's property as a trust. But that notwithstanding that he might be discharged under the act, because the fourth section provided that "no person who, after the passage of the act, shall apply trust funds to his own use," should be discharged, and because that section contemplated that factors might be discharged, inasmuch as it was provided that they should not be discharged where, they had not kept proper books of account. This, it was held, implied that a discharge might be granted to a factor if he did keep proper books of account, even though the debts he owed were contracted in a fiduciary capacity. The case of *White* v. *Platt*, (5 *Denio*, 269,) no way included the consideration of the question presented by the present appeal. The defendant received notes he had hypothecated to the plaintiffs to collect for them, to whom he undertook to return the proceeds. This he failed to do, and the court

Duguid *v.* Edwards.

held that a bankrupt discharge under the act of 1842, constituted no defense to the action. That was the only point presented for decision, and what the court said about the general liability of factors, was not only outside the case, but it is opposed to the general tenor of the authorities bearing upon that subject. The case of *Commonwealth* v. *Stearns,* (2 *Metc.* 343,) has just as little to do with the present controversy. It was an indictment under a statute similar to the one existing in this state against an auctioneer for embezzlement. The crime was alleged to consist in the misappropriation of moneys received by the defendant upon an auction sale of property. And it was held that no crime was committed within the terms of the statute. The court loosely and unguardedly added that moneys received upon sales made by auctioneers and commission merchants were their own moneys. From the cases already cited from the decisions of that court, this could hardly have been intended, for no indication is given of any purpose on the part of the court of overruling what had previously been held on the same subject by that tribunal.

In the enactment of the Code of Procedure the legislature apparently intended to provide for the enforcement of a factor's liability as one in which he held the funds received by him for and on account of the principal. For where the action is to recover moneys which he has received as a factor, provision is made for arresting him. It is not that a factor may be arrested when he has received the money he may be sued for in a fiduciary capacity, but he may be arrested when, as factor, he has received and misappropriated, or refuses to pay over, his principal's money. And in addition to that, other persons also may be arrested, though not enumerated particularly, where they have received the money sued for in a fiduciary capacity. Where the person proceeded against has received moneys in the ordinary course of business, not falling within the legal definition and description of a factor's business, he does not receive it as a factor,

and cannot be arrested for its non-payment under this subdivision of section 179, unless he has received it as agent or broker, or in some other fiduciary capacity. The understanding of the legislature seems to have been that factors, agents and brokers, when acting in their capacities as such, are acting in fiduciary capacities, and have accordingly provided for their arrest, as well as for the arrest of all other persons who may receive and misappropriate moneys received by them in the course of their fiduciary relations. (*Code,* § 179, *subd.* 2,) And this appears to be the construction heretofore adopted by the courts. In *Schudder* v. *Shields,* (17 *How.* 420,) a factor was held to be liable to arrest for not paying over moneys received by him from the sale of a quantity of butter. This case, it is true, involved but a single consignment ; but there is no distinction under the general principles of law applying to this business, which will render the factor liable to arrest upon one transaction that will exonerate him from it where they may be several in number, as they were in the present case. The law applies to all cases alike, whether the transactions be few or many, if the defendants have received the moneys sued for in the course of their business as factors. Where numerous transactions may have taken place, the conduct of the parties relating to them may indicate that it was their intention that the strict relations and obligations of principal and factor should not be observed, but that the business should be carried on upon the plan of simple debtor and creditor. Where that may prove to be the case, the proceeds of the property consigned or delivered to the factor for sale, would not be received by him in any other capacity than that of a simple debtor, and he woud not be liable to arrest for a failure to pay it over, or for using it in his own business. But where that is not the case, the funds he receives for his principal's property are not his own, but those of the principal, who is entitled to receive them whenever he may demand them. A similar application was made of this provision of

Duguid *v.* Edwards.

the Code in the case of *Ostell* v. *Brough*, (24 *How.* 274,) where a factor was held liable to arrest for not paying over the proceeds of lumber received and sold by him as a commission merchant. Under the same subdivision an agent was held to have been properly arrested for not paying over moneys collected by him. (*Stoll* v. *King*, 8 *How.* 298.)

This right to arrest the factor for not paying over the proceeds of property placed in his hands to be sold for his principal is one of the safeguards the law has provided for the protection of the confiding, and often ignorant owners. And the factor should not be allowed to evade or avoid it, without satisfactorily showing that it was the clear understanding of the principal that he was to act for him in some different capacity which necessarily conferred the right of making use of the principal's moneys if the conveniences of his own business required him to do it. The restraints which the law has imposed upon factors and agents cannot be removed or disregardged without endangering much of the business committed to their charge, and affording facilities for the execution of dishonest purposes, which do not at present exist.

In the present case, the defendant Edwards states in his affidavit that the defendants might, if they had been disposed to do so, have sold the one hundred and five barrels of flour they returned to the plaintiffs, and procured and disposed of large portions of property from other houses, and appropriated the proceeds to their own use. But that the integrity of their dealings prevented them from doing so. They are, no doubt, entitled to commendation as men of character and fair dealing for their omission to do this. But how many others there may be who would yield to a similar temptation, if it could be done without exposing themselves to arrest and imprisonment, is, of course, left alone to conjecture. That the number would be increased, if that restraint should be removed, can admit of no serious doubt. The right of the owners of property committed to commis-

sion merchants for sale will be best promoted and maintained by holding the latter to a strict observance of all the obligations the law imposes upon them.

The order appealed from should be reversed, and the motion to vacate the order of arrest should be denied.

DAVIS, J. concurred.

MARVIN, J. dissented.

Order reversed.

[ERIE GENERAL TERM, November 18, 1867. *Daniels, Marvin* and *Davis*, Justices.]